UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**CASSANDRA ROUSE**,                    Case No. 1:10 CV 2142

        Plaintiff,                    Magistrate Judge James R. Knepp, II

    v.                    MEMORANDUM OPINION AND ORDER

**COMMISSIONER OF SOCIAL SECURITY,**

        Defendant.

### Introduction

Plaintiff Cassandra Rouse appeals the administrative denial of supplemental security income (SSI) benefits under 42 U.S.C. § 1383. The District Court has jurisdiction over this case under 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). The parties have consented to the exercise of jurisdiction by the undersigned in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 15). For the reasons given below, the Court affirms the Commissioner's denial of benefits.

### Background

Plaintiff comes from an abusive and dysfunctional family. (Tr. 244). She first filed for SSI benefits on March 4, 2002, and was 43 years old at the time of the ALJ's decision on the current application. (Tr. 34, 306). She finished the 10th grade before dropping out of school but has since received her GED and become certified as a nursing assistant. (Tr. 307).

Medical History

Plaintiff has a history of morbid obesity. (Tr. 141). As a result of her weight, she complains of poor circulation and difficulty standing up. (Tr. 307). She has been diagnosed with bronchial asthma and sleep apnea, though she still smokes six to eight cigarettes a day. (Tr. 169–170). On a

good day, she can walk a block but not up a flight of steps. (Tr. 169). Plaintiff also has a history of drug-related incarcerations, but claims she has not used drugs since 1999. (Tr. 166).

In April 2004, Plaintiff was diagnosed with upper airway resistance syndrome, circadian rhythm disorders, PLM and other parasomnias, idiopathic hypersomnia, narcolepsy, and EBV, ECHO, and Hepatitis infections. (Tr. 144). Plaintiff has been hospitalized for breathing problems multiple times, most recently in 2004. (Tr. 132–135, 169). As a result of her sleep apnea, Plaintiff uses nasal C-PAP at night. (Tr. 169). Plaintiff also has intermittent edema and chest pain when her breathing is tight. (Tr. 169).

At the time Plaintiff filed for SSI benefits, in December 2005, she complained of asthma, depression, anger, suicidal tendencies, auditory hallucinations, and excessive tiredness. (Tr. 76, 87). Plaintiff further asserts her memory is poor. (Tr. 86). According to her medical records, she has difficulty recalling dates, events, and facts in her medical history. (Tr. 170). She underwent an initial psychiatric evaluation at the Murtis H. Taylor Multi-Service Center in March 2006 (Tr. 243), where she was diagnosed with depression, post traumatic stress disorder, polysubstance abuse, and personality disorder. (Tr. 245A). The nurse at Murtis Taylor noted in her findings that Plaintiff had dangerous tendencies and had hit her 2–3 year old nephew in the head. (Tr. 243). Since then, Plaintiff has been attending Murtis Taylor for psychiatry appointments every two weeks. (Tr. 301). The records from Murtis Taylor indicate "poor compliance" by Plaintiff with treatment on multiple occasions. (Tr. 233, 236, 238). They also report Plaintiff cutting herself in January 2007 (Tr. 235), having dangerous impulses (Tr. 239, 242), and attempting to hurt others (Tr. 243).

Plaintiff was evaluated by psychologist Sandy Felker, Ph.D., in March 2006. (Tr. 165). Dr. Felker diagnosed Plaintiff with an unspecified type of mood disorder and an antisocial personality

disorder. (Tr. 167). She concluded Plaintiff has a moderate impairment in her ability to concentrate and attend to tasks and a serious impairment in her occupational functioning. (Tr. 167).

Also in March 2006, Franklin Krause, M.D., examined Plaintiff for her physical impairments and noted "her emotional problems have been evaluated elsewhere." (Tr. 169–170). According to Dr. Krause, Plaintiff is capable of self care and "carries on all activities of daily living" despite her bronchial asthma and sleep apnea. (Tr. 170).

Administrative Hearing

Plaintiff appeared at a hearing before the ALJ on November 10, 2008. (Tr. 295). In her testimony she explained she lives in the basement of her son's ex-girlfriend's house and only leaves the basement to use the bathroom and eat. (Tr. 299–300). Plaintiff testified that she was "scared to go outside because it's so hard out there." (Tr. 304). She said she had been held up at gunpoint the week before the hearing. (Tr. 304).

Plaintiff admitted to considering suicide at times in the past. (Tr. 303). She also admitted to cutting herself on at least one occasion. (Tr. 303). When the ALJ inquired into her emotions, Plaintiff said she feels depressed, helpless, and useless every day. (Tr., 309). She testified her medications offer no relief from her depression. (Tr. 310).

Plaintiff testified she first received psychiatric help after hearing the voices of her deceased relatives. (Tr. 298). The treatment providers at Murtis Taylor give her samples of the medication Invega because she has no money to buy it, and Plaintiff takes these pills every day to help stop the voices she hears. (Tr. 301). Despite the medication, she said she still hears voices every day, which makes her so afraid she sleeps with the lights on and does not go outside. (Tr. 298-299).

Plaintiff testified her weight made it difficult to have a job because she has trouble standing

3

and lifting anything. (Tr. 307). Also, Plaintiff said she had lost her job at Goodwill because she was falling asleep too much. (Tr. 308). She attends church about twice a month – where she feels better but sometimes falls asleep – if she can get a ride. (Tr. 315–316).

Plaintiff was asked about her temper, in response to which she said that when she has all of her grandchildren over they make her so mad she "just want[s] to squeeze their head." (Tr. 318). Otherwise, Plaintiff testified she is able to get along with people okay. (Tr. 311). She occasionally travels to Columbus to visit her mother, and is able to go grocery shopping (and interact with the cashier) without difficulty as long as she gets a ride. (Tr. 314–315).

Plaintiff reported sleeping with sticks by her bed because she "be hearing things" and sees shadows from outside that make her nervous. (Tr. 317). Plaintiff said she keeps a bucket in the basement to use the bathroom because sometimes she is too scared to go upstairs on account of the noises she hears. (Tr. 318).

Also testifying at the hearing was Bruce Holderead, a vocational expert. (Tr. 319). Mr. Holderead testified that a hypothetical person with Plaintiff's impairments would still be able to perform the unskilled occupations of "cleaner, industrial", "cleaner II", and "laundry worker", each of which accounts for thousands of positions in the regional economy. (Tr. 320).

### Standard of Review

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as

4

a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### Standard for Disability

Eligibility for SSI is predicated on the existence of a disability. 42 U.S.C. § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A).  The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 416.920 – to determine if a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform past relevant work?

5.  Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One

5

through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. § 416.920(b)–(f); *see also Walters*, 127 F.3d at 529.

### Discussion

Plaintiff presents three arguments against the ALJ's denial of benefits:

1. The ALJ erred in failing to grant substantial weight to the opinions of Plaintiff's treatment providers.

2. The ALJ erred in his failure to find that the Plaintiff's mental disorder met or equaled 20 CFR Part 404, Subpart P, Appendix 1, Listing 12.04.

3. Evidence submitted subsequent to the hearing is new and material evidence warranting remand.

(Doc. 11, at 8–16).

Treating Physician Rule

Plaintiff's first contention touches upon the deference given to treating sources. An ALJ must weigh medical opinions in the record based on certain factors. 20 C.F.R. § 404.927(d). In determining how much weight to afford a particular opinion, an ALJ must consider: (1) examining relationship; (2) treatment relationship – length, frequency, nature and extent; (3) supportability; (4) consistency; and (5) specialization. *Id.*; *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010).

Generally, the medical opinions of treating physicians are accorded greater deference than

non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). A treating physician's opinion is given "controlling weight" if supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." *Id.* The ALJ must give "good reasons" for the weight it gives a treating physician's opinion. *Id.* Failure to do so requires remand. *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409–10 (6th Cir. 2009).

Under the regulations, a "treating source" includes physicians, psychologists, or "other acceptable medical source[s]" who provide, or have provided, medical treatment or evaluation and who have, or have had, an ongoing treatment relationship with the claimant. 20 C.F.R. § 404.1502. The Sixth Circuit has held that an ALJ has discretion to determine the proper weight to accord opinions from "other sources" such as nurse practitioners. *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530 (6th Cir. 1997)). A medical provider is *not* considered a treating source if the claimant's relationship with them is based solely on the claimant's need to obtain a report in support of their claim for disability. 20 C.F.R. § 404.1502.

Here, Plaintiff argues the ALJ erred by failing to grant substantial weight to the reports of Plaintiff's treatment providers. (Doc. 11, at 9). Specifically, the ALJ deemed two reports – one by Loise Hunt, the other by Pamela Arnold and Grace Herwig – not supported by the medical evidence.

(Tr. 22). Nurse Lois Hunt reported in March 2007 that Plaintiff had poor or no ability to: follow work rules, maintain attention and concentration for extended periods of two hour segments, respond appropriately to changes in routine setting, maintain regular attendance and be punctual within customary tolerances, relate to co-workers, interact with supervisors, function independently without special supervision, work in coordination or proximity to others without being unduly distracted or distracting, deal with work stresses, complete a normal workday and work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 21, 248–249). The same findings were reported by counselor Pamela Arnold and nurse Grace Herwig in October 2008. (Tr. 21, 251–252).

The ALJ did not provide "good reasons" for discrediting the reports from Plaintiff's two nurses and counselor. The ALJ said the documented evidence in the record does not support these treating sources' conclusions. (Tr. 22) ("[T]he record does not support the numerous extreme limitations cited . . . whereby Lois Hunt, MSN, CNS, Pamela Arnold, MA, PC, and Grace Herwig, APN, check marked almost everything on these questionnaires at the highest level of severity."). For instance, the ALJ said Plaintiff "remains fairly active performing household chores, playing cards, and interacting on the phone" and has no record of hospitalizations that would support these extreme limitations. (Tr. 22).

However, even if true, that does not negate the substance of what the opinions say. That is, being able to do household chores, talk on the phone, and play cards does not negate the proposition that Plaintiff has poor or no ability to complete a normal work day without interruption from psychologically based symptoms, to deal with work stresses, to understand and carry out complex job instructions, or to follow work rules. Plus, it is not the case that Plaintiff's treatment providers

8

merely checked all the form's boxes in the most extreme category possible. In fact, Lois Hunt reported Plaintiff has a "fair" ability to socialize (Tr. 249), which is fully consistent with the record of her playing cards and talking on the phone. Hunt also reported a "fair" ability to use judgment, consistent with Plaintiff's testimony that she has no difficulty interacting with cashiers when shopping with her granddaughter. (Tr. 315).

The facts cited by the ALJ as to why the Hunt, Arnold, and Herwig reports lack credibility would not be "good reasons" to discredit their conclusions if they were treating physicians. However, because Hunt, Arnold, and Herwig were not treating physicians, but were "other sources", the ALJ was within his discretion to accord them less deference than a treating physician. *See Cruse*, 502 F.3d at 541. Therefore, remand on this ground is not appropriate.

Listing 12.04

Plaintiff next argues the ALJ erred by not finding Plaintiff's mental disorder met or equaled the listed impairment in 20 C.F.R. Part 404 Subpt. P, App. 1, Listing 12.04. This listing describes Affective Disorders:

> Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation. The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
>
> A. Medically documented persistence, either continuous or intermittent, of one of the following:
> 1. Depressive syndrome characterized by at least four of the following: a. Anhedonia or pervasive loss of interest in almost all activities; or b. Appetite disturbance with change in weight; or c. Sleep disturbance; or d. Psychomotor agitation or retardation; or e. Decreased energy; or f. Feelings of guilt or worthlessness; or g. Difficulty concentrating or thinking; or h. Thoughts of suicide; or i. Hallucinations, delusions or paranoid thinking; or
> 2. Manic syndrome characterized by at least three of the following: a. Hyperactivity; or b. Pressure of speech; or c. Flight of ideas; or d. Inflated self-esteem; or e.

9

Decreased need for sleep; or f. Easy distractibility; or g. Involvement in activities that have a high probability of painful consequences which are not recognized; or h. Hallucinations, delusions or paranoid thinking; or

3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes); And

B. Resulting in at least two of the following:
1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration;

Or

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
1. Repeated episodes of decompensation, each of extended duration; or
2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Part 404 Subpt. P, App. 1, Listing 12.04. The ALJ found the criteria required by 12.04 had not been documented, concluding Plaintiff's impairments do not meet or equal listing level severity. (Tr. 20). The ALJ came to this conclusion by saying Plaintiff has moderate restrictions of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. (Tr. 20–21). The ALJ determined Plaintiff's mental impairments imposed no more than "moderate" limitations in these functional areas. (Tr. 20). Thus, the requirements of B were not met.

To determine whether the ALJ's decision on this point was supported by substantial evidence, the difference between a "moderate" limitation and a "marked" limitation is paramount.

10

The regulations elaborate on how this distinction is drawn in the context of mental impairments:

> Where we use 'marked' as a standard for measuring the degree of limitation, it means more than moderate but less than extreme. A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis.
>
> Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office. In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability. We will determine the extent to which you are capable of initiating and participating in activities independent of supervision or direction.
>
> We do not define 'marked' by a specific number of different activities of daily living in which functioning is impaired, but by the nature and overall degree of interference with function. . . . We do not define 'marked' by a specific number of different behaviors in which social functioning is impaired, but by the nature and overall degree of interference with function. . . . We do not define 'marked' by a specific number of tasks that you are unable to complete, but by the nature and overall degree of interference with function. . . . [I]f you can complete many simple tasks, we may nevertheless find that you have a marked limitation in concentration, persistence, or pace if you cannot complete these tasks without extra supervision or assistance, or in accordance with quality and accuracy standards, or at a consistent pace without an unreasonable number and length of rest periods, or without undue interruptions or distractions.

20 C.F.R. § 404, Subpt. P, App. 1, Listing 12.00(C).

Here, the evidence in the record shows substantial support for the conclusion that Plaintiff meets the A and B criteria under Listing 12.04. Nonetheless, the record also includes substantial support for the ALJ's conclusion that Plaintiff does not meet the criteria under Listing 12.04.

The record suggests Plaintiff has depressive syndrome characterized by several of the symptoms listed in 12.04A (only four of which are needed to meet the A criteria). Plaintiff has documented sleep disturbance, though this may be more a result of Plaintiff's sleep apnea than any mental impairment. (Tr. 239). Plaintiff has complained of decreased energy. (Tr. 107, 108, 238).

11

Plaintiff has feelings of worthlessness; she testified she feels useless every day. (Tr. 309). Evidence of Plaintiff's suicidal thoughts is abundant in the record (Tr. 87, 234, 303), and Plaintiff's treating sources have exhaustively documented Plaintiff's hallucinations or paranoid thinking (Tr. 235–237, 239–242, 245). Also, Plaintiff maintains she has difficulty concentrating or thinking, which is supported by the reports of Herwig, Arnold, and Hunt. (Tr. 111, 248).

Similarly, substantial evidence in the record shows Plaintiff's mental impairments result in marked difficulties in maintaining social functioning and marked difficulties in maintaining concentration, persistence, or pace, as opposed to only moderate difficulties in these areas as the ALJ found. With regards to social functioning, Plaintiff's mental impairments make her so afraid of other people she sometimes uses a bucket as a toilet instead of a readily available bathroom. (Tr. 318). As one of her evaluations states, she has poor or no ability to relate predictably in social situations. (Tr. 249). She has a documented history of throwing objects and attempting to hurt others. (Tr. 243). This is not evidence of a person who can function in a social environment. These facts substantially support a marked difficulty in Plaintiff's ability to maintain social functioning.

As for maintaining concentration, persistence, or pace, the record shows Plaintiff has the ability to perform many simple tasks such as cooking, cleaning, and making telephone calls but questions her ability to maintain such simple tasks without assistance and without undue interruptions or distractions. For instance, Plaintiff is too afraid to go to her appointments without another person (Tr. 304–305), is afraid to go outside (Tr. 299), and has problems paying attention (Tr. 111). Plus, as discussed above, two of Plaintiff's treatment providers have reported Plaintiff has poor or no ability to "complete a normal workday and work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number

12

and length of rest periods." (Tr. 249, 252).

Even though substantial evidence supports a finding contrary to the ALJ's, the Court must still affirm if substantial evidence also supports the ALJ's position. *Early v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Here, the ALJ cited Plaintiff's ability to perform daily activities like playing cards, taking care of a grandchild, reading, doing chores, preparing meals, and talking on the phone, as evidence of only moderate limitations. (Tr. 20). But a claimant's ability to perform simple tasks does not preclude a finding of a marked difficulty. *See* 20 C.F.R. § 404, Subpt. P, App. 1, Listing 12.00(C). The record also shows that Plaintiff's ability to do these tasks is actually rather limited. For example, Plaintiff testified she braids her granddaughter's hair (Tr. 305), but she loses her temper and "wants to squeeze [her grandchildren's] head[s]". (Tr. 318). Her ability to care for children is further called into question by the fact she reportedly often throws things and once hit her 2 or 3 year-old nephew in the head. (Tr. 243). In Plaintiff's application for SSI benefits, she even said she is scared to have her children around her because she feels like hurting herself and others. (Tr. 87). Plaintiff testified that she actually does *not* read anything but television listings anymore (Tr. 312) and does *not* talk on the phone with people (Tr. 304) (Q. "Do you ever call and talk to people?" A. "No."). Plaintiff is too afraid and unwilling to go outside without another person. (Tr. 109, 299, 300).

Despite all of the evidence to the contrary, the ALJ's position is still supported by substantial evidence. First, evidence in the record indicates that some of Plaintiff's symptoms are not caused by her mental impairment, meaning they should not be considered in determining whether Plaintiff meets the criteria for a listed mental impairment. For instance, according to a 2004 report in the record from Berta Briones, M.D., Plaintiff's sleep disturbances and "excessive daytime sleepiness"

13

are caused by various unrelated physical, rather than mental, health problems which long predate her psychiatric treatment history. (Tr. 141, 143–144). Similarly, Plaintiff acknowledged in her hearing testimony that the visual hallucinations she reports seeing are nothing more than literal shadows cast through the window from people outside. (Tr. 317) ("I'm in the basement. I see shadow – I know I got a window. I see people going past the windows and stuff."). Also, Plaintiff's testimony indicates her fear of going outside is likely a natural reaction to her mugging and other crime in the area, not a symptom of some mental impairment:

> Q. Do you ever go anywhere alone?
>
> A. No. Last I went somewhere alone – I just went somewhere with my friend just last week and a man, right there on 55, and he tried to rob us. He put a gun up to my forehead but we didn't have no money or nothing so he let us go.
>
> Q. Okay.
>
> A. So I be scared to go outside because it's so hard out there.

(Tr. 304).

Second, substantial evidence supports the ALJ's contention that Plaintiff is able to maintain daily activities and social functioning without significant interference from her mental impairments. In fact, Dr. Krause said as much in his evaluation of her. (Tr. 170). Despite her testimony, Plaintiff stated in the paperwork submitted to the Social Security Administration in July 2006 that she does talk on the phone to others and does venture outside alone. (Tr. 83, 109, 110). She is capable of grocery shopping as long as she gets a ride to the store. (Tr. 314–315). She plays cards with relatives (Tr. 314) and cooks meals for others (Tr. 312–313). She cleans her room. (Tr. 311, 316). She is capable of riding the bus to visit with her aunt. (Tr. 313–314). She can take her granddaughter to the park. (Tr. 315). These facts support the conclusion that Plaintiff's mental impairment creates no

more than moderate difficulties in maintaining social functioning and no more than a moderate limitation in daily living activities. The ALJ is also correct that no evidence in the record shows episodes of decompensation. Thus, the ALJ's determination that the B criteria were not met is supported by substantial evidence.

<u>New and Material Evidence</u>

Plaintiff contends a remand is necessary because of new material evidence. Specifically, Plaintiff seeks to have the Commissioner consider medical records from Plaintiff's visits to Murtis Taylor between November 2008 and May 2009, subsequent to the ALJ's hearing. After review of the records at issue, the Court believes they are not material because there is not a reasonable probability a different disposition would have been reached if the evidence had been presented initially.

Before a social security claim can be remanded for consideration of additional evidence, the claimant must prove that new evidence exists which would be material to the determination of her disability claim. *Sizemore v. Sec. of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir 1988). The party seeking remand bears the burden of showing remand is proper under sentence six of 42 U.S.C. § 405(g). *Id.* (citing *Oliver v. Sec. of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986)). To satisfy the claimant's burden on materiality, she "must demonstrate that there was a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Id.* (citing *Carroll v. Califano*, 619 F.2d 1157, 1162 (6th Cir. 1980)). Claimant must also show good cause, meaning "a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).

15

Even assuming Plaintiff has shown good cause for why these records were not produced sooner, they do not sufficiently bolster her claim of disability. Rather, they appear for the most part to be a continuation of the same symptoms and treatment. The records reflect the same chief complaints of hearing voices, sleeping too much, and feeling depressed. (Tr. 262–265). Moreover, one of the newly produced records reports Plaintiff "continues to use cocaine". (Tr. 269). This new evidence makes it *less* likely Plaintiff would be found disabled. *See* 42 U.S.C. 1382c(a)(3)(J) ("[A]n individual shall not be considered to be disabled [if] drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled."). Therefore, there is no reasonable probability the Commissioner would have reached a different disposition had this evidence been considered. The evidence is not material and a sentence six remand is not warranted.

### Conclusion

Following review of the arguments presented, the record, and applicable law, the Court finds the ALJ's decision denying benefits supported by substantial evidence. The Commissioner's decision is affirmed.

IT IS SO ORDERED.

                              s/James R. Knepp II
                        United States Magistrate Judge